# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| MISTY LAPORTE, | ) |
| | ) |
| **Plaintiff,** | ) |
| | )     **Civil No.** |
| **v.** | )     **13-12084-FDS** |
| | ) |
| LABORATORY CORPORATION OF | ) |
| AMERICA HOLDINGS and MARIE | ) |
| DANIEL, | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

_____)

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action for sex discrimination arising out of the termination of an employee. Plaintiff Misty Laporte was employed by defendant Laboratory Corporation of America Holdings as its director of strategic alliances in the New England area. Defendant Marie Daniel was Laporte's direct supervisor. Laporte's employment was terminated less than three months after she told defendants she was pregnant. She has brought suit against defendants for violations of state and federal anti-discrimination laws, alleging that her termination was motivated by unlawful discriminatory animus.

Defendant has moved for summary judgment on plaintiff's claims. For the following reasons, the motion will be granted.

# I.      Background

## A.      Factual Background

The following facts are undisputed unless otherwise noted.

### 1.      LabCorp Hires LaPorte

Laboratory Corporation of America Holdings ("LabCorp") is a corporation organized under the laws of Delaware with its principal place of business in Burlington, North Carolina. (Def. SMF ¶ 2).  The company sells, among other things, medical laboratory tests and services to health-care providers through a national network of clinical laboratories.  (*Id.*).

In March 2012, LabCorp developed a plan to develop so-called "strategic alliances" with hospitals in the New England area.  (*Id.* ¶ 14).  A "strategic alliance" is a contractual business relationship where LabCorp partners with a hospital to provide laboratory services and, in some cases, takes over the operation of the hospital's laboratory.  (*Id.*).

As part of its strategic plan, LabCorp created a new position called director of strategic alliances for the New England area.  (*Id.* ¶ 15).  The director's job was to create strategic-alliance partnerships with hospitals and healthcare systems in the New England area.  (*Id.* at 16). The director had sales quota of $6 million per year.  (Daniel Dep. at 89).

On June 18, 2012, Misty Laporte was hired by LabCorp to fill the new position.  (Def. SMF ¶ 18).

In her new position, LaPorte was primarily tasked with entering into three types of strategic-alliance models, called the technical support, cooperative, and owned and operated models.  (*Id.* ¶ 23).  She was not hired to enter into joint-equity ventures with hospitals, or situations where the hospital and LabCorp would co-own the organization operating the

laboratory.  (*Id.* ¶ 24).  Her duties included researching hospitals and healthcare systems to determine what alliance model was the most appropriate for the target; formulating a strategic plan as how to best approach the target; contacting high-level executives of the target; and developing presentations to deliver to the target's executives.  (*Id.* ¶ 27).

LaPorte was hired as an at-will employee and understood that her position could be eliminated at any time.  (*Id.* ¶ 21).  Marie Daniel, LabCorp's vice-president of alliances, mergers, and acquisitions, was LaPorte's supervisor.  (*Id.* ¶ 3).  At LaPorte's interview, Daniel told her that the sales cycle of a strategic alliance could last two or three years.  (Pl. SMF ¶ 110).

When she started working at LabCorp, LaPorte learned that not every hospital in the New England area was a viable target for a strategic alliance.  (*Id.* ¶ 25).  In particular, hospitals and health systems that already used LabCorp as their primary reference laboratory were not viable alliance targets.  (*Id.*).  Hospitals and healthcare systems that had already entered into an alliance relationship with one of LabCorp's competitors were also not viable targets until those relationships were up for renewal.  (LaPorte Dep. at 93).

LaPorte was instructed not to target certain hospitals and healthcare systems in the New England area for various reasons.  Those included Partners Health System, Steward Health Care System, and the hospitals in Rhode Island. (Def. SMF ¶ 26).   LaPorte was also told that another LabCorp employee, Kevin O'Connell, would be taking the lead on entering a strategic alliance with the MetroWest Medical Center.  (*Id.*; LaPorte Dep. at 90-91).

During LaPorte's six-month employment with LabCorp, she contacted high-level executives from more than 20 hospitals and health systems.  (Def. SMF ¶ 28).  The majority of those targets declined a meeting, indicated they were not interested in pursuing a relationship

with LabCorp, or did not respond.  (*Id.*).  LaPorte secured meetings with four prospective

partners:  Berkshire Medical Center, New England Baptist, Bristol Hospital, and Lahey Health

System.  (*Id.* ¶ 29).

Ultimately, none of those prospects entered into a strategic alliance with LabCorp.  (Def.

SMF ¶¶ 30-32).  Berkshire and New England Baptist both declined to enter a strategic alliance

relationship with LabCorp.  (*Id.* ¶ 31).  Bristol was acquired by Vanguard Health Systems, which

eliminated any opportunity of a strategic alliance with LabCorp.  (*Id.*).  The parties dispute

whether Lahey was still considering a strategic alliance with LabCorp when LaPorte was

terminated.  LaPorte contends that she was still in discussions with Lahey when she was

terminated; Daniel contends that Lahey told her it was not interested in pursuing a strategic

alliance.  (LaPorte Dep. at 107, 225, Ex. 22; Daniel Dep. at 127-28).  Lahey never entered into a

strategic alliance with LabCorp.  (Daniel Dep. at 127-28).

## 2.     Character of the New England Hospital Market

Between June and December 2012, several changes occurred in the New England

hospital market.  (Daniel Dep. at 64-65).  According to Daniel, the market "dramatically

changed" because more large hospitals bought smaller hospitals, and more healthcare systems

bought smaller hospitals.  (*Id.*).  These changes affected the potential for future strategic

alliances with LabCorp.

For example, in September or October of 2012, Vanguard Health Systems and Tufts

Medical Center announced a proposed joint venture to pursue the purchase of independent

hospitals throughout Massachusetts and Connecticut.  (*Id.* at 77-78).  If the venture went forward

as proposed, Tufts would no longer be a target for a strategic alliance with LabCorp.  (*Id.* at 61,

78).  Instead, LabCorp entered into discussions with Vanguard to enter the joint venture.  (*Id.* at 78).[1]  Tufts and Vanguard never entered into their proposed joint venture.  (Pl. SMF ¶ 147).

In addition, between June and December 2012, Steward Health Care System continued to acquire smaller hospitals across New England.  (Def. SMF ¶ 38).  Because Steward had an established relationship with one of LabCorp's competitors, LabCorp could no longer target the acquired hospitals for strategic partnerships.  (*Id.*).[2]  In October 2012, UMass Memorial Medical Center announced it was entering into a joint venture with a LabCorp competitor, Quest Diagnostics.  (*Id.* ¶ 39).  LabCorp could no longer target UMass for a strategic alliance after that deal.  (*Id.*).[3]  In November 2012, LabCorp learned that Partners, the largest hospital system in Massachusetts, declined a proposal of LabCorp for a strategic alliance and renewed its business agreement with one of LabCorp's competitors.  (*Id.* ¶ 42; Daniel Dep. 161-62).[4]

---

[1] Although LaPorte disputes that the announcement of a proposed venture does not make that venture final, she does not dispute that the venture made Tufts an inappropriate target for a strategic alliance.  (Pl. Resp. to Def. SMF ¶¶ 36-37).

[2] LaPorte contends that the hospitals nonetheless continued to be a target for strategic alliances with LabCorp.  (Pl. Resp. to Def. SMF ¶ 38).  This runs counter to her deposition testimony, where she admitted that hospitals who have already entered into strategic alliances with one of LabCorp's competitors were not appropriate targets.  (LaPorte Dep. at 93).

LaPorte also contends that Steward's acquisition of one hospital was announced in April 2012, and therefore defendants knew that the hospital was not an appropriate target when they hired her.  (*See* Pl. Ex. 6).  The sale was finalized in September 2012.  (Daniel Dep., Ex. 3).

[3] There is some dispute as to when LabCorp knew that UMass Memorial would no longer be a viable target for a strategic alliance.  LaPorte testified at her deposition that she was told that LabCorp was still in negotiations with UMass Memorial at the time she was interviewed for her position at LabCorp, and therefore it was still a viable target at the time she was hired.  (LaPorte Dep. at 285-85, 291).  Defendant Daniel testified at her deposition that LabCorp had ceased discussions with UMass Memorial before LaPorte was hired, and therefore it was not a viable target when LaPorte was hired.  (Daniel Dep. at 76-77).

[4] LaPorte contends that Partners did not reject a strategic alliance with LabCorp.  The cited exhibit, a request for information from Partners to LabCorp, does not support that contention.  (*See* Pl. Ex. 7).

There is also some dispute as to whether Partners acquired any hospitals while plaintiff was employed by LabCorp.  At her deposition, Daniel testified that Partners did acquire hospitals during that period.  (Daniel Dep. at 65-66).  A printout of Partners's website, however, shows that Partners did not acquire a hospital between 2011 and

The parties characterize these events differently.  LabCorp contends that these events were "rapid changes in the New England hospital market" that constituted "a trend of consolidation in [New England] as large hospitals an health systems continued to purchase smaller hospitals."  (Def. SMF ¶¶ 34-35).  LaPorte contends that "the alleged consolidation had been ongoing for a number of years and was depicted as the very reason for need to create [her] position in the first place."  (Pl. Resp. to Def. SMF ¶ 35).

According to Daniel, the New England area was the only area that did not meet its sales quota of $6 million in 2013.  (Daniel Dep. at 52).  However, LabCorp did finalize a strategic-alliance opportunity with MetroWest Medical Center in July 2013, which would be credited toward the New England sales quota in 2013.  (*Id.* at 63-64).

### 3.      Problems with LaPorte's Performance

LaPorte contacted executives of potential strategic-alliance partners by letter, telephone, and e-mail.  (Def. SMF ¶ 59).  She knew it was important to have proper grammar, spelling, and formatting in her letters and e-mails.  (*Id.* ¶ 60).  However, LaPorte's draft letters and e-mails contained multiple errors.  (*Id.* ¶ 61).  On July 23, 2012, Daniel asked LaPorte to provide her with copies of all of LaPorte's previously written correspondence so she could review them. (*Id.* ¶ 63).  Daniel also asked LaPorte to send her drafts of all her letters before they were sent to hospital executives.  (*Id.* ¶ 64).  It was "standard practice" for Daniel to review and edit drafts of correspondence with hospital executives for LabCorp's strategic-alliance directors for other regions.  (*Id.* ¶ 67).

Daniel continued to find errors in LaPorte's drafts.  (*Id.* ¶ 62).  During the summer of

2013.  (Pl. Ex. 8).

2012, Daniel also had several conversations with another LabCorp employee about LaPorte's lack of attention to detail in presentations and correspondence. (*Id.* ¶ 68).

In August 2012, Daniel asked LaPorte to attend a new-hire training session in Raritan, New Jersey, during the week of September 17. (*Id.* ¶ 69). LaPorte attended the first day of training on September 17. (*Id.* ¶ 70). On September 18, at 5:31 a.m., LaPorte sent Daniel an e-mail stating that she had uncontrolled vomiting and would have to reschedule the training. (*Id.* ¶ 71). She told Daniel that she thought she needed antibiotics. (*Id.* ¶ 74). Daniel replied by e-mail, stating that LaPorte was excused from the training on that day but should attend the training the next day, September 19. (*Id.* ¶ 72). LaPorte returned to Massachusetts instead of staying for the next day's training. (*Id.* ¶ 73).

On September 24, 2012, Daniel, LaPorte, and Barbara Kenney met to discuss LaPorte's recent job performance. (*Id.* ¶ 76). Daniel requested the meeting because she was unhappy with LaPorte for ignoring her direct instructions and leaving the training in New Jersey early. (*Id.* ¶ 78).

At the beginning of the September 24 meeting, LaPorte informed Daniel that she was pregnant. (*Id.* ¶ 79). She gave Daniel a doctor's note dated September 21, 2012, that indicated that LaPorte was to be excused from work on September 19, 20, and 21 for complications with gastric ulcers and her pregnancy. (*Id.* ¶ 81). This was the first time LaPorte had told anyone at LabCorp that she was pregnant. (*Id.* ¶ 84). Daniel did not say anything in response to LaPorte's pregnancy announcement. (*Id.* ¶ 85).[5] At her deposition, LaPorte testified she believed that Daniel treated her in a "hostile manner" after she announced she was pregnant. (LaPorte Dep. at

---

[5] According to LaPorte, "She didn't even say congratulations." (Pl. Resp. to Def. SMF ¶ 85).

239).  She also testified that she believed that Daniel's behavior towards her changed after her announcement.  (*Id.*).

During the September 24 meeting, Daniel criticized LaPorte for her spelling, grammar, and letter writing.  (*Id.* ¶ 80).  At one point, the meeting became heated, but Daniel only raised her voice when discussing LaPorte's writing issues.  (*Id.*).  LaPorte suggested that she and Daniel set up a standing meeting once or twice a week to discuss her progress.  (*Id.* ¶ 86). Daniel said she was unable to commit to a set date and time every week, but that LaPorte should call each week to set up a time.  (*Id.*).

Later on September 24, LaPorte sent an e-mail to Kenney outlining specific issues she had with Daniel.  (LaPorte Dep., Ex. 13).  LaPorte was critical of Daniel for not involving her on projects, not responding to her suggestions that she join membership committees, not letting her sit in on meetings, not introducing her to other directors at LabCorp, critiquing her spelling and grammar, and not having time to approve all of her draft letters and e-mails.  (*Id.*).  She also believed that Daniel had a hostile reaction to her medical issues.  (*Id.*).  At her deposition, Kenney first testified that she thought the medical issue was LaPorte's pregnancy, but later testified that she thought the medical issue was LaPorte's vomiting.  (Kenney Dep. 113-14, 116-17).

Daniel continued to review LaPorte's draft letters and e-mails.  (Def. SMF ¶ 91). LaPorte continued to make grammar and formatting mistakes.  (*Id.*).

### 4. Termination of LaPorte's Employment

Daniel first considered terminating LaPorte's employment in October or November of 2012.  (Daniel Dep. at 126-27).  At the time, she had several discussions with another LabCorp

employee, Bill Haas, about the New England marketplace.  (Def. SMF ¶ 45).  They discussed the

changes in the marketplace, diminished strategic-alliance opportunities due to consolidation, the

lack of interest from hospitals concerning strategic-alliance relationships, and LaPorte's lack of

success in getting meetings with hospitals and other possible targets.  (*Id.*).  They determined

that LabCorp needed to modify its market strategy in New England, focusing its attention

towards establishing joint-equity ventures in the region and developing relationships with

independent physician practices in accountable care organizations.  (*Id.* ¶ 46).

The joint-equity ventures were outside of LaPorte's job responsibilities.  (*Id.*).

According to Daniel, the ACO relationships were outside LaPorte's job responsibilities as well.

(Daniel Dep. at 141-42).  LaPorte did discuss ACOs at least once in a presentation to new hires

of LabCorp.  (Daniel Dep., Ex. 18, at 5).

On October 10, 2012, Daniel sent an e-mail to LaPorte identifying formatting corrections

on a powerpoint presentation to Bristol.  (LaPorte Dep., Ex. 14).  Part of that e-mail stated:

> [Y]our powerpoint must be correct and reflect the image of our organization.
> Misspellings, poor grammar, uneven font size and format errors compromise our image
> and the potential deal.  An executive wants to know that we pay attention to the "details."
> We must be a trusted consultant, they are handing over their laboratory and trust that it
> will be run with great attention to detail!  Your [presentation] must reflect that capability
> and expertise!!  This is fundamental teaching in any business school!  The fact that you
> claim to have . . . sales experience, both on your resume and in your interview, le[]d Bill
> and I to believe that you knew all the fundamental skills . . . includ[ing] effective
> communication, letter writing, grammar and spelling skills, prospect investigations,
> target account selling, sales strategy and navigating the politics of hospital administrative
> offices.
>
> To date, your work does not reflect any of these skills.
>
> The above changes that I made are all basic fundamentals that effect your performance.
> We discussed this in detail at your performance review.
>
> I will not discuss this with you again.

(*Id.*).

In mid-October, LabCorp hired a strategic-alliance director for the New Jersey and Pennsylvania area. (Pl. SMF ¶ 144). It also hired a business-development director for the New York and New Jersey area. (*Id.*).

Sometime before November 21, 2012, Daniel and Kenney decided that because LaPorte's performance was not improving, they should start her on a "performance improvement plan" ("PIP") according to company policy. (Def. SMF ¶ 96). The PIP was completed, and put in its final form, but was never delivered to LaPorte. (Kenney Dep. at 90).[6]

On November 19, 2012, Daniel asked LaPorte to attend a multi-day training session in New Jersey at the end of the month. (Def. SMF ¶ 99). LaPorte was to present an overview of the sales process to new strategic-alliance directors. (*Id.*). While at the training, Daniel grabbed copies of sample contracts that LaPorte had printed in preparation for the training from her and ripped them up in her face. (Pl. SMF ¶ 150).

LaPorte went home immediately after the training. (Def. SMF ¶ 103). Daniel called and e-mailed her to ask if she was sick. (*Id.* ¶ 104). LaPorte saw this as harassment. (*Id.*).

In late November or early December 2012, LabCorp decided to eliminate LaPorte's position and terminate her employment. (Def. SMF ¶ 49). On November 28, Daniel sent an e-mail to LabCorp's human resources department, outlining a new strategy for the company in New England that would result in the termination of LaPorte's employment. (Pl. SMF ¶ 132).

On December 13, 2012, Daniel met with LaPorte and told her that her position was being

---

[6] LaPorte contends that Daniel and Kenney gave different testimony as to who wrote the PIP. (*See* Pl. SMF ¶¶ 130-31). The cited testimony does not appear to be contradictory. In any event, whether Daniel was heavily or lightly involved in writing the PIP is not material to plaintiff's claims in this case.

eliminated because of the lack of viable strategic-alliance opportunities in the New England area. (Def. SMF ¶ 51). LaPorte believed that there were still plenty of such opportunities left in the market, although admitted at her deposition that her belief was speculation. (*Id.* ¶ 54; LaPorte Dep. at 238). At her deposition, she also testified that Daniel had a "very happy, smiley face" and "almost gloated" during the meeting where LaPorte's employment was terminated. (LaPorte Dep. at 239).

LabCorp did not pursue any new strategic alliances in New England after LaPorte's termination. (Def. SMF ¶¶ 53-55). LabCorp did finalize a strategic alliance with MetroWest in July 2013. (Pl. Resp. to Def. SMF ¶ 43). LabCorp has not re-opened LaPorte's position or hired anyone to replace her as strategic-alliance director of the New England area. (Def. SMF ¶ 11).

### 5. Ellis Affidavit

Annie Ellis was employed by LabCorp as the business-development director for the New England region from January 2012 until August 2012. (Ellis Aff., Pl. Ex. 4, ¶ 1). Daniel was her direct supervisor. (*Id.* ¶ 2). Ellis's job was to target large multi-hospital groups, small stand-alone hospitals, and ACOs. (*Id.* ¶¶ 7-8). In her affidavit, Ellis alleges that Daniel praised LaPorte soon after LaPorte was hired. (*Id.* ¶ 5).

Ellis resigned from her position at LabCorp soon after an incident in July 2012. (*Id.* ¶ 14). At that time, she was approached by Daniel, who treated her in a hostile, threatening, and humiliating manner. (*Id.* ¶ 11). Daniel told Ellis that she had heard that an employee named Helen Pierson had made a complaint about her to LabCorp's human resources department. (*Id.*). Ellis "understood that there was a price to pay for complaining to [h]uman [r]esources as it would not be held confidential and once . . . Daniel found out there would clearly be retaliation."

(*Id.* ¶ 13).[7]

## B. **Procedural Background**

On July 8, 2013, plaintiff filed the complaint in this case in Norfolk Superior Court.  The complaint alleges claims of (1) pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, against both defendants; (2) pregnancy discrimination in violation of Mass. Gen. Laws ch. 151B, § 4, against both defendants; and (3) intentional interference with advantageous relations against defendant Daniel.[8]  On August 27, defendants removed the case to this Court.  On April 30, 2014, defendants filed a motion for summary judgment.

## II. **Standard of Review**

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotations omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).  In evaluating a

---

[7] Defendant contends that the Ellis affidavit is unsworn.  However, the affidavit contains Ellis's signature under the sentence, "Signed under the pains and penalties of perjury this fifth day of May 2014."  (Ellis Aff. at 3).

[8] To sue under Title VII, a plaintiff must ordinarily exhaust his or her administrative remedies with the Equal Employment Opportunity Commission and the Massachusetts Commission Against Discrimination.  *See* 42 U.S.C. § 2000e-f(f)(1); *Franceschi v. United States Dep't of Veterans Affairs*, 514 F.3d 81, 85 (1st Cir. 2008). Although it is unclear from the record whether and when plaintiff exhausted her administrative remedies, defendants do not dispute that she has met this requirement.

summary judgment motion, the court indulges all reasonable inferences in favor of the non-moving party. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotations omitted). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.[9]

## III.    Analysis

### A.    Failure to Comply With Local Rule 7.1

Plaintiff contends that defendants' motion for summary judgment should be denied because they failed to comply with Local Rule 7.1(a)(2), which provides that "[n]o motion shall be filed unless counsel certify that they have conferred and have attempted in good faith to resolve or narrow the issue."

The parties dispute whether defendants properly complied with Local Rule 7.1(a)(2). However, "a violation of the rule does not *necessitate* summary denial." *Maloney v. Town of Hinsdale*, 2012 WL 4103909, at *2 (D. Mass. Aug. 10, 2012) (citing *Blanchard v. Swaine*, 2010 WL 4922699, at *5 (D. Mass. Nov. 9, 2010)). The rule is designed "to encourage parties into narrowing the issues before bringing a dispute into court." *Charter Envtl., Inc. v. Shaw Envtl., Inc.*, 2009 WL 2982772 at *16 (D. Mass. Sep 14, 2009) (citing *Hasbro, Inc. v. Serafina*, 168

---

[9] Plaintiff repeatedly contends that under *Reeves v. Sanderson Plumbing Prods. Co.*, 530 U.S. 133 (2000), a court deciding a summary judgment motion "must disregard all evidence favorable to the moving party that the jury is not required to believe." 530 U.S. at 151. It appears that she reads *Reeves* as precluding summary judgment where the movant relies on any evidence that a jury could disbelieve, regardless of whether that evidence is disputed. The First Circuit, however, has rejected this interpretation of *Reeves*, concluding that courts deciding summary judgment motions can consider "testimony that is uncontradicted by the movant." *Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851, 856 (1st Cir. 2008); *see also LaFrenier v. Kinirey*, 550 F.3d 166, 168 (1st Cir. 2008).

F.R.D. 99, 100 (D. Mass. 1996)). Thus, in cases where "conferral between the parties . . . would have been unlikely to resolve or narrow the issues in contention and . . . [p]laintiff would have opposed the motion . . . in any event," summary dismissal of the motion is inappropriate. *Id.*; *see also Edwards v. New England Tel. and Tel. Co.*, 86 F.3d 1146, at *1 (1st Cir. 1996) (table decision) (district court need not summarily deny a motion for summary judgment where "plaintiff was not likely to change a position he had held for over a year in the six-week period after [an] abortive [settlement] conference").

In this case, among other things, it does not appear that any of the issues in contention would have been resolved or narrowed; plaintiff opposes defendants' motion in its entirety. Furthermore, plaintiff knew about the summary judgment motion well before it was filed. *Compare Casual Male Retail Grp., Inc. v. Yarbrough*, 527 F. Supp. 2d 172, 180 (D. Mass. 2007) (violation of local rule did not result in prejudice and therefore did not warrant sanctions) *with Converse Inc. v. Reebok Int'l Ltd.*, 328 F. Supp. 2d 166, 170 (D. Mass. 2004) (sanctions under local rule appropriate when a party waited until the Friday before a holiday weekend to "blind side" the opposing party with an emergency motion). Therefore, even assuming defendants violated Local Rule 7.1(a)(2), the Court will not deny the motion on that basis. *See United States v. Roberts*, 978 F. 2d 17, 20 (1st Cir. 1992) ("A district court possesses great leeway in the application and enforcement of its local rules."); *Gerakaris v. Champagne*, 913 F. Supp. 646, 651 (D. Mass. 1996) ("[O]mitting to confer prior to filing a motion certain to be opposed does not warrant so severe a sanction as summary denial.").

B.    **Title VII Claims**

The complaint first alleges claims of discrimination under Title VII. Under Title VII, it is unlawful for an employer "to discharge any individual . . . because of such individual's race,

14

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). A sex discrimination claim under Title VII can be based on allegations of discrimination due to pregnancy. *Id.* § 2000e(k).

Where, as here, there is no direct evidence of discriminatory intent, the court employs the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, the burden falls initially to a plaintiff to set forth a *prima facie* case of discrimination. 411 U.S. at 802. A properly-established *prima facie* case gives rise to an inference of discrimination. *See Ingram v. Brink's, Inc.*, 414 F.3d 222, 230 (1st Cir. 2005). The burden then shifts to an employer to provide a legitimate, nondiscriminatory reason for its decision. *Id.* "If the employer does so, the burden of production reverts to the plaintiff, who must then prove that the employer's neutral reasons were actually a pretext for the alleged discrimination." *Id*.

To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that

> (1) he or she is a member of a protected class; (2) possessed the necessary qualifications and adequately performed his or her job; (3) was nevertheless dismissed or otherwise suffered an adverse employment action at the hands of his or her employer; and (4) his or her employer sought someone of roughly equivalent qualifications to perform substantially the same work.

*Aly v. Mohegan Council, Boy Scouts of Am.*, 711 F.3d 34, 46 (1st Cir. 2013).

Defendants contend that plaintiff has not shown any evidence that she has met the fourth prong of that test—that someone of roughly equivalent qualifications performed her work after her employment was terminated.[10] Plaintiff contends that it is nonsensical for the fourth factor to require a showing that the defendants hired another individual to replace her because defendants

---

[10] Defendants also contend that plaintiff has not satisfied the second prong of the test. The Court does not reach this issue.

15

completely eliminated her position.

It is true that "a plaintiff need not demonstrate that a new employee was hired or a current employee was formally designated as a replacement in order to satisfy the fourth prong of the prima facie case." *Rodriguez-Torres v. Caribbean Forms Mfr., Inc.*, 399 F.3d 52, 59 (1st Cir. 2005). However, the plaintiff must still show that the employer "had a continuing need for the work that [the plaintiff] was performing prior to her termination." *Id.* For example, a plaintiff could produce evidence that a defendant's other employees assumed the plaintiff's tasks after her employment was terminated. *See id.* ([T]he proof that [other employees] assumed [plaintiff's] tasks, in addition to performing their original duties, was adequate to establish the final element of the prima facie case.").

It is undisputed in this case that defendants did not hire anyone to replace plaintiff. It is also undisputed that defendants pursued no new strategic alliances with hospitals or healthcare systems in the New England area after the termination of plaintiff's employment. Although defendants entered into a strategic alliance with MetroWest Medical Center in July 2013, those negotiations had been ongoing before plaintiff was hired, and another employee had taken the lead in those negotiations. Finally, it is undisputed that plaintiff's position was eliminated and that her responsibilities were not shifted to any of defendants' other employees.

Plaintiff's single dispute of fact on this point is that she was involved in pursuing relationships with ACOs in the New England area, and that defendants continued to pursue those relationships after her employment was terminated. As evidence, she points out that she prepared a presentation for the training on November 28, 2012, that included a slide that reads: "Target prospects in which LC strengths have the largest impact . . . Creating an ACO or 'patient centered healthcare model.'" (Daniel Dep., Ex. 18, at 5). The apparent inference plaintiff seeks

to draw is that because she discussed ACOs in a training presentation, she was responsible for pursuing relationships with ACOs.

It is undisputed that plaintiff's targets were hospitals and healthcare systems, and that defendants had a separate ACO staff. (Pl. Resp. to Def. SMF ¶ 15; Daniel Dep. at 141-42). Therefore, even if plaintiff did pursue relationships with ACOs, there is no evidence that those responsibilities belonged to her. *See Cosme-Montalvo v. Trafon Grp., Inc.*, 2013 WL 1798009, at *4 (D.P.R. Apr. 29, 2013) (finding that plaintiff did not establish fourth prong of her *prima facie* discrimination claim because the duties she claimed to have performed that survived her termination were assigned to another employee, and therefore were not her duties).[11] There is therefore no genuine dispute that defendants did not have a continuing need for plaintiff's work after her termination. *Compare Villanustre v. Hard Rock Café Puerto Rico, Inc.*, 556 F. Supp. 2d 79, 84 (D.P.R. 2008) (fourth prong not met where "[d]efendants claimed, and [p]laintiff did not contest or offer any contrary evidence, that after [p]laintiff['s] . . . termination she was not replaced and her position remained vacant") *with Sills v. Waddel & Reed, Inc.*, 2009 WL 5943105, at *8 (D. Mass. Feb. 25, 2009) ("[T]he fact that [p]laintiff's functions were transferred to other . . . [m]anagers is sufficient to establish that [p]laintiff satisfied the fourth prong of the test . . . .").

Even if plaintiff could prove a *prima facie* case of discrimination, she has also failed to demonstrate that defendants' stated reasons for terminating her employment were a pretext for unlawful discrimination. Defendants have provided a legitimate, non-discriminatory reason for

---

[11] Plaintiff also cites to the Ellis affidavit, which states that Ellis targeted ACOs as part of her employment. (Pl. Ex. 4 ¶ 8). Even assuming the truth and admissibility of the affidavit, the fact that Ellis targeted ACOs does not show that LaPorte targeted ACOs.

terminating plaintiff's employment:  that changes in the marketplace rendered her position obsolete.  Plaintiff's criticisms of defendants' business judgment are, admittedly, based on her own opinion and speculation.  (LaPorte Dep. at 238).  Such speculation cannot create a genuine issue of material fact sufficient to defeat summary judgment.  *See Woodward v. Emulex Corp.*, 714 F.3d 632, 639 (1st Cir. 2013) (rejecting criticism of employer's business judgment because "nothing in [the company's] actions casts doubt on the sincerity of its belief that the market had shifted"); *see also Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003) ("[S]ummary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." (internal quotations omitted)).[12]

In addition, plaintiff's evidence is not enough to establish a genuine issue of disputed fact as to defendant's discriminatory animus.  First, she contends that defendant Daniel acted in a hostile manner toward her after she announced she was pregnant.  However, her subjective interpretation of and speculation regarding Daniel's demeanor is not enough to create a dispute of fact to survive summary judgment.  *See DiBlasi v. Liberty Mut. Grp. Inc.*, 2014 WL 1331056, at *12-13 (D. Mass. Apr. 3, 2014) (rejecting claim of discriminatory animus where plaintiff only offered evidence of her own interpretation of her supervisor's displeasure, facial expressions, and unhappiness).  Second, plaintiff points to the Ellis affidavit and its allegations concerning Helen Pierson.  Assuming the truth and admissibility of the affidavit, it is unclear, to say the least, how Pierson's interactions with Daniel are relevant to LaPorte's situation.  There is also no

---

[12] Plaintiff also contends, for various reasons, that the marketplace changes were known to defendants when she was hired.  Her contentions are either immaterial to the marketplace changes that defendants describe or unsupported by the evidence.

allegation in the Ellis affidavit that Daniel was discriminating or retaliating against Pierson in a discriminatory fashion.[13]

Accordingly, defendants' motion for summary judgment will be granted as to the Title VII claims.[14]

### C. Chapter 151B Claims

The complaint also states claims of pregnancy discrimination under Mass. Gen. Laws ch. 151B, § 4. Like Title VII, Chapter 151B makes it unlawful for and employer to, "because of the . . . sex . . . of any individual to refuse to hire or employ or to bar or to discharge from employment such individual . . . ." Mass. Gen. Laws ch. 151B, § 4. Massachusetts courts follow the *McDonnell Douglas* framework for state-law claims of discrimination. *See Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 40-41 (2005). Under Massachusetts law, a plaintiff "may satisfy the fourth element of her prima facie case by producing some evidence that her layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination." *Id.* at 45.

However, the "mere termination of a competent employee when an employer is making cutbacks due to economic necessity is insufficient to establish a prima facie case." *Id.* at 44 (quoting *LaGrant v. Gulf & Western Mfg. Co.*, 748 F.2d 1087, 1090 (6th Cir. 1984)). Plaintiff has failed to produce evidence that her layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination. Even though she contends that defendant was

---

[13] Plaintiff also contends that Daniel and Kenney made contradictory statements of fact in their depositions as to the PIP. The cited depositions, however, are not contradictory. (*See* Daniel Dep. at 148, 153-55; Kenney Dep. at 83, 88-89, 90, 93). Even if they were contradictory, either version of the facts would not support plaintiff's claim that Daniel attempted to terminate plaintiff's employment due to discriminatory animus based on her pregnancy.

[14] In addition, plaintiff cannot pursue her Title VII claim against defendant Daniel because "there is no individual employee liability under Title VII." *Fantini v. Salem State Coll.*, 557 F.3d 22, 31 (1st Cir. 2009).

filling open positions for strategic-alliance directors for other regions, she fails to establish that those positions faced the same marketplace changes as the New England area. *See id.* at 49-50 (*prima facie* case established where defendant "retained . . . male attorneys with the same job classification as [plaintiff], who had been rated lower than she had in the last performance evaluation conducted before the reduction in force").

Even assuming plaintiff has established a *prima facie* case of discrimination under the state-law standard, the speculative opinions she presents to challenge defendants' reason for terminating her employment, as explained above, are insufficient to show that the given reason was a pretext for unlawful discriminatory animus. Accordingly, defendants' motion for summary judgment will be granted as to the Chapter 151B claims.

### D.     Claim for Intentional Interference with Advantageous Relations

Finally, the complaint alleges a claim for intentional interference with advantageous relations against defendant Daniel. In an action for intentional interference with advantageous relations, an employee must prove that "(1) she had an advantageous employment relationship with her employer; (2) the defendant knowingly induced the employer to break that relationship; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the employee was harmed by the defendant's actions." *Cariglia v. Hertz Equipment Rental Corp.*, 363 F.3d 77, 88 (1st Cir. 2004) (quoting *Weber v. Community Teamwork, Inc.*, 434 Mass. 761, 781 (2002)). Where, as here, the action is brought against the plaintiff's supervisor, the "supervisor who discharges or recommends discharge of an employee is not liable for interference with the employee's contract or business relations unless the supervisor's actions are motivated by actual malice." *Id.* (quoting *Galdauckas v. Interstate Hotels Corp.*, 901 F. Supp. 454, 465 (D. Mass. 1995)). "Actual malice" is defined as "spiteful,

malignant purpose, unrelated to the legitimate corporate interest." *Id.* (quoting *Shea v. Emmanuel Coll.*, 425 Mass. 761, 764 (1997)).

Plaintiff, in her opposition, admits that her intentional-interference claim is grounded in her discrimination claims, contending that "[a]ctions involving unlawful discrimination have been found to contain the requisite improper motive for sustaining a claim of tortious interference." (Pl. Mem. at 19 (citing *Comey v. Hill*, 387 Mass. 11, 19 (1982)). As explained above, plaintiff cannot sustain her discrimination claims, and therefore cannot show that defendant Daniel was improperly motivated to terminate her employment because she was pregnant. Plaintiff has provided no evidence of an alternative improper motive on Daniel's part.

Accordingly, defendant's motion for summary judgment will be granted as to the intentional-interference claim.

## IV.    Conclusion

For the foregoing reasons, defendant's motion for summary judgment is GRANTED.

**So Ordered.**

 /s/ F. Dennis Saylor
F. Dennis Saylor IV

Dated: June 20, 2014                    United States District Judge